11-3591-cr(L)
***United States v. Goffer***

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: March 11, 2013      Decided: July 1, 2013
Errata Filed: July 25, 2013)

Docket No. 11-3591-cr(L)

UNITED STATES OF AMERICA,

*Appellee*,

-v.-

ZVI GOFFER, CRAIG DRIMAL, MICHAEL KIMELMAN,

*Defendants-Appellants*,

JASON GOLDFARB, ARTHUR CUTILLO, EMANUEL GOFFER, DAVID PLATE,

*Defendants.*[*]

Before:
        WALKER, SACK, AND WESLEY, *Circuit Judges.*

Defendants Zvi Goffer, Michael Kimelman, and Craig Drimal appeal from convictions of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and sentences

---

[*] The Clerk of the Court is directed to amend the caption in the case to conform with the above.

entered in the Southern District of New York (Richard J. Sullivan, *Judge*). Defendants allege that (1) wiretap evidence is inadmissible in prosecutions of securities fraud; (2) the jury lacked sufficient evidence to prove Defendants' knowledge of the insider source; (3) the jury instructions on conscious avoidance were improper after the Supreme Court's decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, -- U.S. --, 131 S.Ct. 2060 (2011); (4) the district court improperly excluded a rejected plea bargain; and (5) the sentences were higher than other white-collar defendants receive for comparable thefts. We hold that (1) wiretap evidence is admissible where the wiretap was lawfully obtained, and wire fraud remains a predicate offense to obtain a wiretap; (2) there was sufficient evidence from which a jury could reasonably infer Defendants' *mens rea*; (3) conscious avoidance law was not altered by *Global-Tech*; (4) the district court properly excluded evidence of a rejected plea bargain; and (5) Defendants' sentences were reasonable in light of the magnitude of their theft and the 18 U.S.C. § 3553(a) factors. The judgment of the district court is accordingly AFFIRMED.

---

ALEXANDER MARTIN DUDELSON, Law Office of Alexander M. Dudelson, Brooklyn, NY, *for Appellant Zvi Goffer*.

MICHAEL S. SOMMER (Morris J. Fodeman, Scott D. Tenley, *on the brief*), Wilson Sonsini Goodrich & Rosati, P.C., New York, NY, *for Appellant Michael Kimelman*.

ARLENE VILLAMIA-DRIMAL, Weston, CT, *for Appellant Craig Drimal*.

ANDREW L. FISH, Assistant United States Attorney (Richard C. Tarlowe, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, *for Appellee United States of America*.

---

WESLEY, *Circuit Judge*:

Defendants Zvi Goffer, Michael Kimelman, and Craig Drimal were convicted in the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b-5-2, and 18 U.S.C. § 2.[1]  Goffer and Kimelman were convicted after a 13-day jury trial; Drimal pled guilty. Goffer was convicted of two counts of conspiracy to commit securities fraud and twelve counts of securities fraud; Kimelman was convicted of conspiracy to commit securities fraud and two counts of securities fraud; and Drimal pled guilty to conspiracy to commit securities fraud and five counts of securities fraud.  Drimal and Goffer appeal their sentences and Kimelman and Drimal challenge their convictions based on evidentiary rulings, jury instructions, and sufficiency of the evidence.[2]

---

[1] Jason Goldfarb also filed a notice of appeal but no brief; his appeal was dismissed by an order of this court dated March 16, 2012.

[2]  We address Defendants' additional arguments in a related order.  *United States v. Goffer*, 2013 WL 3285137(2d Cir. 2013) (summary order).

3

## Background

Goffer, Kimelman, and Drimal, along with non-party defendants, conducted a double-blind, high-volume insider trading network that led the participants to acquire over $10 million in profits. Goffer, who worked as a proprietary trader[3] at the Schottenfeld Group, LLC ("Schottenfeld"), spearheaded the conspiracy.

In 2007, Drimal traded from the offices of the Galleon Group ("Galleon"), a firm led by Raj Rajaratnam. Kimelman, previously an attorney at a New York law firm, traded for Quad Capital ("Quad"), a proprietary trading firm. In late 2007, Kimelman, Goffer, and Goffer's brother Emanuel established a new trading firm, Incremental Capital ("Incremental"), though they retained their other positions. In early 2008, Kimelman left Quad to trade with Emanuel, and Goffer began trading at Galleon. Kimelman and Goffer spoke often and shared information that led them to trade in the same stocks. In 2007 and 2008, Kimelman and Goffer traded 151 stocks within five days of each other, including 88 stocks that they both traded on the same day.

---

[3] Proprietary traders use the firm's capital to make trades and retain half of the profits that they earn.

4

## I.  The Conspiracy

In the summer of 2007, Arthur Cutillo and Brian Santarlas, attorneys at Ropes & Gray LLP, met with Jason Goldfarb, a workers' compensation attorney who had attended law school with Cutillo.  Goldfarb indicated to the Ropes & Gray attorneys that he had a friend who traded stocks and would pay for information about corporate acquisitions.  The Government showed at trial that Goffer was this friend. What followed was a series of "tips" in which Cutillo and/or Santarlas would obtain material non-public information and pass it to Goldfarb, who, in turn, would pass it to Goffer. Goffer distributed these "tips," which frequently related to impending takeovers, to friends and partners.  Based on these tips, Goffer and his co-conspirators would acquire positions in the targeted companies and profit from the takeover's effect on the share price.

Goffer's network used prepaid cellular telephones to avoid detection; these phones – used by the attorneys and the traders – were destroyed after each successful tip. *See, e.g.,* Tr. 429-31, 436-37; Gov't Ex. 114, 127. Throughout the relevant time period, Goffer spoke with co-conspirators, especially Kimelman, guardedly when on the

5

phone. For instance, he described the P.F. Chang's tip as "a good thing" but "nothing I'm going to talk about on the telephone." Gov't Ex. 145.  Goffer often asked Kimelman to meet in person or "in the street" when conveying sensitive information.  They also discussed countermeasures and ways to avoid detection, suspecting that high-volume trades in little-traded companies immediately prior to their acquisition could raise regulatory eyebrows. Goffer relied on Kimelman to provide him with insights into the meaning of legal documents associated with the acquisitions, including revised merger agreements, settlement agreements, signature pages, and limited guarantees, *inter alia*.

**II.  The 3Com Tip**

The first tip presented at trial related to Bain Capital's bid to acquire 3Com.  When Cutillo and Santarlas learned about the progress of the deal – for example, by finding documents entitled "closing agenda" or "signature papers" on Ropes & Gray's document management system or on a communal printer - they reported this progress to Goldfarb, who passed it on to Goffer.  Goffer shared information relating to the takeover bid with some of his co-conspirators.  Goffer frequently convened a group of co-

conspirator traders (typically including Emanuel, Kimelman, and David Plate, another Schottenfeld trader) at a bar where the group would discuss the progress of the takeover bid and any new information that Goffer had received regarding the plans.

On August 7, 2007, Goffer, Drimal, Emanuel, and Plate began acquiring 3Com stock based on the material nonpublic information that Goffer received from Goldfarb. Gov't Ex. 10. That evening, Goffer had a 25-minute phone conversation with Kimelman.[4] The next day, Kimelman purchased 94,200 shares of 3Com stock. That week, forbidden from purchasing more 3Com stock by Quad's risk management team, Kimelman sent an otherwise wordless email to Goffer into which he had pasted an instant message conversation with Quad's risk management expert.

Goffer also provided details about the acquisition and the sources of his information to Drimal; Drimal passed both on to David Slaine, a cooperating witness. Drimal explained that the information came from an attorney from "Ropeson" who risked "his whole . . . career and maybe going to jail" by sharing these tips. Gov't Ex. 206, 208.

_____

[4] This conversation predated, and therefore was not recorded by, the wiretaps employed by Government investigators in this case.

7

On September 27, 2007, Goffer told Plate and other co-conspirators that the acquisition of 3Com would happen the next day. Goffer had learned that the signature papers were prepared and he confirmed with Kimelman, who verified, based on his background as an attorney, that signature papers "were what they sounded like; they were something that took place at the end of a deal." Tr. 831-32, 1067. Kimelman was either present or was consulted over the phone. Bain announced its acquisition of 3Com the next day; the co-conspirators all profited.[5] Goffer told Plate that he needed to pay his source, and identified those who were contributing (including Drimal); the co-conspirators paid Santarlas, Cutillo, and Goldfarb $25,000 each.

**III. Other Tips**

In November 2007, Santarlas overheard other Ropes & Gray associates discussing a client's upcoming acquisition of Axcan. Santarlas, who did not work on mergers and acquisitions, accessed at least four documents on the Ropes & Gray document management system relating to the acquisition; he and Cutillo shared the tip with Goldfarb.

---

[5] Goffer earned $378,608; Kimelman earned $243,716 in his Quad account and $16,687 in another account; and Drimal earned $4,535,000. Gov't Ex. 10.

Goldfarb passed the attorneys' information to Goffer, who disseminated it (at a minimum) to Drimal and Slaine. Drimal shared the information with Michael Cardillo, a Galleon trader, though he again attributed the tip to "Ropeson" attorneys. Tr. 1106. Drimal and Plate purchased Axcan stock and benefitted from the Axcan acquisition announced on November 29, 2007; Drimal gained $1,984,867. Goffer did not trade Axcan because it was a small, rarely-traded stock and he did not want to attract regulatory attention. Tr. 657-58.

In February 2008, Santarlas learned about a possible takeover of P.F. Chang's China Bistro, Inc. ("P.F. Chang's") from a colleague; he conveyed this information to Goldfarb, who shared it with Goffer. Tr. 131-34, Gov't Ex. 2. A few days later Goffer called Kimelman to seek his advice, but noted that it was "nothing I'm going to talk about on the telephone." Gov't Ex. 145. Kimelman agreed to come into Manhattan to "figure out our plan of attack." *Id.* Goffer, Emanuel, and Kimelman decided to purchase P.F. Chang's stock as part of an acquisition of a broad restaurant portfolio to disguise their use of the inside information. Tr. 849-50. Goffer instructed the group that "everything's got to be

9

printed out" to help them "go about . . . justifying a trade." Gov't Ex. 149. No P.F. Chang's acquisition was announced in 2008.

In March 2008, Cutillo and Santarlas observed that deal documents for Bain Capital's acquisition of Clear Channel Communications, Inc. ("Clear Channel") were laid out in a "closing room" at the law firm, apparently ready for execution, and reported that closing was imminent. Unbeknownst to these tippers, neither of whom worked on the deal, the Clear Channel acquisition was staged so that the lenders could be sued for specific performance. When the deal did not close as anticipated, Goffer, Kimelman, and Drimal all suffered losses on their Clear Channel investments.

In May, there was more Clear Channel activity at the Ropes & Gray offices. Cutillo passed the information to Goldfarb, who told Goffer. Tr. 494-95, Gov't Ex. 198. Goffer summoned Kimelman for an "urgent meeting;" immediately afterwards, he called another trader and told him to purchase Clear Channel call options for "everybody." Gov't Ex. 199, 201. Over the next two business days, Clear Channel publicly announced that it was in settlement talks

10

with the lenders and that an amended merger agreement had been reached.  The market reacted favorably to this news and Goffer earned over $1 million in profits in his Galleon account trading on this tip.

Schottenfeld trader Gautham Shankar provided several tips to Goffer, including acquisitions of Kronos, Inc. and Hilton Hotels Corp. ("Hilton").  Tr. 650-51.  Goffer, Kimelman, Drimal, and Emanuel benefitted from trading on this inside information.  Profits from these illegal trades were included in calculating the loss amount for sentencing purposes, but the trades were not charged at trial.

**IV.  Recruitment of David Slaine**

In the fall of 2007, Goffer and Kimelman recruited David Slaine to join Incremental Capital. The co-conspirators hoped that Slaine, who unbeknownst to them was working as a cooperating witness after his own arrest for insider trading, would provide them with the financial backing to get their insider trading-fueled business off the ground.  Kimelman urged Goffer to tell Slaine that he would "get great information" by investing with Incremental. Gov't Ex. 114A.  Goffer mentioned that he had received tips about certain acquisitions before they happened, including

11

3Com, Axcan, and Hilton.  Gov't Ex. 212.  Goffer jokingly told Slaine that the information came from a construction worker, but when pushed he elaborated "you [are] probably better off not knowing where they were coming from...[Y]ou don't want to know where it's coming from obviously."  Gov't Ex. 222.  Kimelman chimed in, asserting that the source was that "[g]uy fixing that pothole down there."  *Id.*

**V.  Trial and Sentencing**

The Government's evidence at trial included testimony from Slaine, Santarlas, Plate, Cardillo, and a Ropes & Gray partner.  It also included recordings of Slaine's conversations with Goffer, Kimelman, Drimal, and Emanuel; wiretap recordings of Goffer's conversations with Kimelman, Drimal, Emanuel, and others; instant messages and e-mails sent between the co-conspirators; telephone records; and trading records.

Defendants were convicted on all counts.  The district court sentenced Drimal (who pled guilty) to 66 months' imprisonment, Goffer to 120 months' imprisonment, and Kimelman to 30 months' imprisonment.  The district court also entered forfeiture orders of $11 million, $10,022,931, and $289,079 against Drimal, Goffer, and Kimelman, respectively.

12

**Discussion**

Defendants challenge (1) the admission of wiretap evidence in support of their securities-fraud convictions; (2) the sufficiency of the evidence to support Kimelman's conviction on the substantive counts of insider trading; (3) the district court's jury instructions on conscious avoidance;[6] (4) the district court's exclusion of evidence that Kimelman rejected a plea bargain; and (5) the sentences they were issued.  Other arguments raised by Defendants are addressed in a related summary order.  *Goffer*, 2013 WL --.

**I.  Lawfully-Obtained Wiretap Evidence Is Admissible in a Securities Fraud Prosecution**

Defendants contend that the district court erred in permitting the Government to introduce evidence obtained through wiretaps because securities fraud is not a predicate offense under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III"), and because the evidence was not intercepted incidentally to an otherwise lawful wiretap.  *See* 18 U.S.C. §§ 2516(1), 2517(5).  Concurring with the analysis of a

---

[6] "The Supreme Court appears to now prefer the appellation 'willful blindness.'"  *United States v. Ferguson*, 676 F.3d 260, 278 n.16 (2d Cir. 2011).  However, "[b]ecause the parties used the term 'conscious avoidance' below, we continue to use that term for purposes of this case."  *United States v. Coplan*, 703 F.3d 46, 89 n.39 (2d Cir. 2012).

recent and related case in the Southern District of New York, we hold that the evidence was lawfully obtained and therefore properly admitted. *See United States v. Rajaratnam*, No. 09-cr-1184(RJH), 2010 WL 4867402, at *1-6 (S.D.N.Y. Nov. 24, 2010), *aff'd,* No. 11-4416-cr, -- F.3d --, 2013 WL 3155848 (2d Cir. June 24, 2013).

Defendants assert two flaws with the wiretap evidence that the Government adduced at trial.[7]  First, they allege that the wiretap evidence should be excluded because securities fraud is not a predicate offense under Title III. Second, they allege that the intercepts are not admissible in a securities fraud prosecution unless interception of information relating to securities fraud is inadvertent. Neither argument is persuasive.

Title III contains an exclusionary rule prohibiting the use at trial of "unlawfully intercepted" communications.  18

---

[7] Drimal also contends that the wiretap intercepts were predicated on "dishonest manipulation by the government" and (we presume) that they should therefore have been excluded.  "A defendant who pleads guilty unconditionally . . . waives all challenges to prosecution except those going to the court's jurisdiction." *United States v. Lasaga*, 328 F.3d 61, 63 (2d Cir. 2003).  Drimal, who entered an unconditional guilty plea, waived this meritless argument.  Moreover, the wiretap applications specify the nature of Goffer's scheme and explicitly note that securities fraud (a) will be uncovered and (b) is not a predicate offense for Title III.

U.S.C. §§ 2518(10)(a)(i), 2515. To benefit from the exclusionary rule, Defendants have to establish that the wiretaps were illegal.

Section 2517(5) of Title III governs the use of evidence obtained on a wiretap "relating to offenses other than those specified in the order of authorization or approval." 18 U.S.C. § 2517(5). "[T]he purpose of § 2517(5) . . . is to prevent 'subterfuge searches,' in which the government uses a warrant authorizing seizure of one type of evidence as a license to collect evidence of an offense not covered by the authorization." *United States v. Smith*, 726 F.2d 852, 865 (1st Cir. 1984). "'[O]ther' offenses under Section 2517(5) may include offenses, federal as well as state, not listed in Section 2516 so long as there is no indication of bad faith or subterfuge by the federal officials. . . ." *In re Grand Jury Subpoena Served on Doe*, 889 F.2d 384, 387 (2d Cir. 1989).

When an authorized wiretap intercepts "communications relating to offenses other than those specified in the order of authorization," 18 U.S.C. § 2517(5), "disclosure or use" of those communications is permissible provided "a subsequent application . . . made to a judge of competent

15

jurisdiction [demonstrates] the good faith of the original application." *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976). "Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." *Id.* (quoting S. Rep. No. 90-1097, at 2189 (1968)). We perceive no reason why the principle undergirding this rule - that disclosure or use of communications intercepted incidentally to an otherwise lawful, good faith wiretap application does not violate Title III - should not apply when the Government forthrightly discloses the probability of intercepting "communications relating to other offenses" *ex ante*, at the time it makes its initial wiretap application. "Congress did not intend that a suspect be insulated from evidence of one of his illegal activities gathered during the course of a bona fide investigation of another of his illegal activities merely because law enforcement agents are aware of his diversified criminal portfolio." *United States v. McKinnon*, 721 F.2d 19, 23 (1st Cir. 1983).

In this case, Government investigators indicated in the wiretap applications that, in addition to wire fraud, they expected to uncover evidence of securities fraud (which, they expressly noted, is "not a predicate offense under 18 U.S.C. § 2516"). This representation ensured that the wiretaps were not obtained as a "subterfuge" or to surreptitiously investigate crimes other than those about which they informed the court.[8]

"[W]hen the government investigates insider trading for the bona fide purpose of prosecuting wire fraud, it can thereby collect evidence of securities fraud, despite the fact that securities fraud is not itself a Title III predicate offense." *Rajaratnam*, 2010 WL 4867402, at *6. The ten judges reviewing wiretap applications in this case found that the Government proved that it had a good-faith investigation of wire fraud and/or money laundering. The fact that the Government also informed the approving courts that Defendants were involved in a conspiracy to commit securities fraud did not immunize Defendants from otherwise

---

[8] Kimelman argues that not every case of insider trading will involve wire fraud. We do not reach the question of whether insider trading not involving wire fraud might permit a court to approve a wiretap; we instead focus on the case at hand in which Defendants' conduct constituted both.

17

lawful interception of communications related to their wire fraud.  The wiretap evidence was lawfully obtained and properly admitted.

**II.  The Jury Had Sufficient Evidence to Convict Kimelman of Securities Fraud**

Kimelman challenges the sufficiency of the evidence supporting his substantive securities fraud conviction for his purchase of 15,000 shares of 3Com stock on August 10, 2007 and 5,000 shares of 3Com stock on September 25, 2007. Specifically, he contends that the Government did not prove that Goffer had tipped him about 3Com or that he knew or consciously avoided knowing that Goffer had material nonpublic information about 3Com that was disclosed in violation of a fiduciary duty.[9]  More specifically, he argues that the Government's main evidence, an unrecorded phone call he had with Goffer on August 7 and an email he wrote to Goffer on August 15, does not indicate that he received a tip from Goffer or knew that any such tip was based on illegally-disclosed information.  He also insists that a discussion he had with the other co-conspirators on

_____

[9] Kimelman does not challenge, and we therefore do not discuss, any elements of insider trading aside from the knowing use of material nonpublic information obtained in violation of a fiduciary duty.

18

September 27, on the eve of the deal's announcement, cannot count as proof of his awareness of the earlier fraud.

"[A] liable tippee must know that the tipped information is material and non-public . . . 'and the tippee *knows or should know* that there has been a breach'" of fiduciary duty. *SEC v. Obus*, 693 F.3d 276, 287 (2d Cir. 2012) (emphasis retained) (quoting *Dirks v. SEC*, 463 U.S. 646, 660 (1983)). The Government did not need to prove that Kimelman knew the identity or nature of the source if he knew that the information was illegally obtained. *Id.* In denying Kimelman's Rule 29 motion, the district court described this as "a verdict that could go either way" and "certainly a close case," but decided that the "jury's verdict [was not] unreasonable such that it should be overturned." Reviewing *de novo* and "crediting 'every inference that the jury may have drawn' in the government's favor," we agree. *United States v. Hassan*, 578 F.3d 108, 122 (2d Cir. 2008) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)).

A court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find "the evidence in its totality, not in

19

isolation," sufficient to support guilt beyond a reasonable doubt. *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). This requirement is particularly critical where, as here, some evidence derives its probative force from other evidence. "'[T]he jury's verdict may be based entirely on circumstantial evidence.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008)(quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)). Moreover, we need not find that *every* reasonable jury would have convicted Kimelman; we affirm "if we find that *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Stewart*, 590 F.3d 93, 109 (2d Cir. 2009) (internal quotation marks omitted, emphasis in original).

Kimelman argues that we should exclude from our analysis evidence related to activity *after* the trades at issue. We reject this argument. Kimelman's knowledge of the illicit nature of Goffer's source after the trades is still probative (though not in itself sufficient to establish his knowledge before the trades).

Evidence indicating a defendant's knowing participation in a later stock manipulation scheme is relevant to the

20

earlier scheme where, for example, it shows that a defendant was "conversant in the language of stock manipulation." *United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007). This analysis applies equally in the context of insider trading. "Relevancy cannot be reduced to [a] mere chronology; whether the similar act evidence occurred prior or subsequent to the crime in question is not necessarily determinative to its admissibility[ and therefore its probative value]." *United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990). Subsequent acts are frequently probative as to intent. *See, e.g., United States v. Germosen*, 139 F.3d 120, 127-28 (2d Cir. 1998). Here, Kimelman's participation in Goffer's ongoing scheme led to later transactions that "so closely paralleled the charged conduct that it was probative regardless of the temporal difference." *United States v. Curley*, 639 F.3d 50, 61 (2d Cir. 2011).

    If we focus on the evidence in the record from prior to the public announcement of Bain's bid for 3Com on September 28, 2007, and credit every inference that the jury could have drawn in the Government's favor, we find ample support for the jury to conclude that Kimelman was tipped by Goffer

and knew or consciously avoided knowing that Goffer's tip about 3Com was based on nonpublic information illegally disclosed in breach of a fiduciary duty.

The Kimelman-Goffer telephone call of August 7, though unrecorded, marked a change in Kimelman's 3Com stock trading behavior. Prior to August 7, Kimelman day-traded 3Com stock in smaller quantities of 1,000, 2,000 and 5,000 shares, including on August 5, just two days before the call. Kimelman did not maintain those positions but sold them before the end of each trading day. On August 8, the day after the evening phone call, however, Kimelman bought 94,200 shares of 3Com, easily his largest single-day purchase, which he did not sell. In the subsequent days and weeks, he continued to add to that position - buying another 24,000 shares on August 9 and 15,000 more shares on August 10. He maintained the accumulated position until after the 3Com merger bid was announced; when the share price shot up, he sold the position and profited.

Kimelman was so aggressive in acquiring 3Com that his employer at Quad restrained him from making further purchases of 3Com stock. Despite the warning from Quad, Kimelman managed to buy 5,000 more shares of 3Com on

22

September 25.  From August 7 to 8, Kimelman's behavior changed from being very cautious about 3Com to suddenly becoming very confident.  Such a sudden change in a defendant's stock trading pattern, which cannot be readily explained by other reasons, could be probative of trading on insider information.  *See United States v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998)(recognizing "situations in which unique trading patterns or unusually large trading quantities suggest that an investor had used inside information").

His e-mail to Goffer on August 15, with news of Quad's restraint, indicates at the very least that the two were actively discussing the trading in 3Com shares.  Kimelman's new 3Com trading behavior matched that of Goffer and of the other co-conspirators who were tipped by Goffer on August 7.  And like the others, Kimelman cashed out of his 3Com positions shortly after Bain's bid was announced.  Parallel trading patterns among co-conspirators can be another indicator of insider trading.  *See, e.g., SEC v. Warde*, 151 F.3d 42, 47-48 (2d Cir. 1998).  In this case, the manner in which Kimelman sold the stock is at least suggestive of the motive he had for buying it, which was not for long term investment value, but in anticipation of a particular event.

23

Also revealing is the discussion Kimelman had with Goffer on the eve of the 3Com deal's announcement on September 27. Goffer asked about the significance of signature pages in a pending transaction, and Kimelman explained that the preparation of the signature pages meant that a deal signing was imminent. As a former associate at a leading corporate law firm, Kimelman had to know that Goffer, in asking such a question, was privy to the inner workings of a pending transaction to be aware of the status of signature pages. Since Goffer had no legal basis to have access to such information, Kimelman must therefore have known or been aware of a high probability that this insider information was made available to Goffer in breach of a fiduciary duty. Indeed, it was from this exchange that Plate, who testified about the conversation, became convinced that Goffer's tip was illegally obtained.

Kimelman also argues that much of the Government's evidence applied equally convincingly to Plate, who claimed at trial that he did not know of Goffer's inside source until the "signature pages" conversation. However, a rational juror could readily infer from the trust that Goffer showed in Kimelman by asking him about the signature

pages and the matter-of-fact manner in which Kimelman answered - without astonishment as to Goffer's knowledge or expression of concern about the sensitivity of such information - that Kimelman shared a relationship of trust with Goffer that Plate did not.  This, in turn, would support an inference that Kimelman had some degree of prior awareness of Goffer's illegal source of information, even if the jury also concluded that Plate had no such awareness.  Moreover, the jury was free not to credit Plate's self-serving testimony that he did not know about the source of the inside information.  "[W]e defer to a jury's assessments with respect to credibility [as long as they are] 'reasonably based on evidence presented at trial.'" *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Ceballos*, 340 F.3d 115, 125 (2d Cir. 2003)).

After September 2007, evidence of his knowledge of the fraud becomes overwhelming and Kimelman does not deny the sufficiency of the showing in support of his conspiracy conviction.  Goffer later described Kimelman and Emanuel as members of his "inner circle" or "tight circle."  A rational juror could find that this circle came together well before

25

those statements were made and prior to the beginning of the 3Com trades. The government produced evidence from July 2007 showing that the trio bought and profited from shares of Hilton Hotels shortly after Goffer received an insider tip. Goffer and Emanuel, along with co-conspirators outside the "inner circle," bought shares of 3Com on August 7. Kimelman's habit of feigning indifference to the source of Goffer's information in the presence of co-conspirators not within the "inner circle" also continued in the subsequent months.

Viewed in its totality, the Government's proof provides enough evidence for a reasonable jury to conclude that Kimelman was guilty beyond a reasonable doubt of insider trading in 3Com. The jury's verdict is supported by sufficient evidence and is not unreasonable; we affirm Kimelman's conviction.

## III. The Conscious Avoidance Jury Instructions Were Proper

Over Kimelman's objections,[10] the district court

---

[10] The Government urges plain error review, maintaining that Kimelman did not specifically object to the conscious avoidance instruction as to each charge or request that the district court limit the instructions to the conspiracy charge. However, Defendants went to lengths to ensure that their objections to all conscious avoidance instructions were preserved, and the district court acknowledged that "[e]verybody's preserving their objections [to the conscious avoidance instructions]." We therefore engage in *de novo* review. *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011).

instructed the jury on the theory of "conscious avoidance," which permits a jury to convict a defendant for "deliberately clos[ing] his eyes to what would otherwise have been obvious to him." *United States v. Gansman*, 657 F.3d 85, 94 (2d Cir. 2011). Kimelman appeals the issuance and the substance of jury instructions on conscious avoidance as to the illicit origins of Goffer's tips. Finding no flaw in either, we affirm.

**A. There Was a Factual Predicate for the Instruction**

"A conscious avoidance instruction 'may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction [] and (2) the appropriate factual predicate for the charge exists, i.e. the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (quoting *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000)) (internal alterations and some quotation marks omitted). In this case, the first prong is met; Kimelman claimed ignorance at trial as to the source of the 3Com tip.

27

However, Kimelman contends that there was insufficient evidence (1) for a juror to conclude that he was aware of a high probability that the 3Com tip came from an insider and chose to avoid confirming that fact, and (2) for a juror to conclude that he *ever* knew about the illicit nature of Goffer's information.  We disagree.

For substantially the same reasons discussed above, there was ample evidence supporting the inference that if Kimelman did not know about those facts, that he had to have consciously avoided becoming aware of them.  First, given the 25-minute telephone conversation he had with Goffer on the evening of August 7, the abrupt and pronounced change in his trading pattern of 3Com stock immediately thereafter, his subsequent outreach to Goffer about 3Com trading on August 15, and the fact that Goffer had shared the tip with other co-conspirators whom Kimelman knew, a rational juror was entitled to conclude that Kimelman was aware of a high probability that Goffer had insider information about 3Com. Second, the fact that Goffer asked about signature pages on the eve of the 3Com deal announcement and the routine manner in which Kimelman answered the question, again provides the basis for a juror to conclude that he was aware of a high

28

probability that the source of Goffer's information was illegal.

With respect to Kimelman's conscious avoidance of knowledge of Goffer's sources throughout the conspiracy, Kimelman's challenge lacks any merit. While he and Kimelman were recruiting Slaine for Incremental, Goffer told Slaine that he was "better off not knowing where [his tips] were coming from." Gov't Ex. 222. That way, Goffer continued, if "someone from the government ever ask[ed] you where did [that tip] come from. You [would] be like, I don't freakin' know where it came from." Building on Goffer's (facetious) assertion that his source was a construction worker, Kimelman added that it was a "[g]uy fixing that pothole down there." His additions to this conversation about the need for plausible deniability underscore Kimelman's conscious avoidance of knowledge as to Goffer's source. The jury was entitled to hear the conscious avoidance instruction.

Kimelman's argument that the Government's evidence sought to prove actual knowledge rather than conscious avoidance is both unsupported and irrelevant. "Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *United*

29

*States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) (citing *United States v. Nektalov*, 461 F.3d 309, 316-17 (2d Cir. 2006)).

**B.  The Content of the Instructions Was Proper**

Kimelman alleges that the district court erred in declining to amend its jury instructions to accord with the Supreme Court's ruling in *Global-Tech Appliances, Inc. v. SEB S.A.*, -- U.S. --, 131 S. Ct. 2060 (2011).  Specifically, Kimelman contends that the *Global-Tech* decision required that jury charges indicate that "the mental state of recklessness is insufficient for a finding of conscious avoidance."  Because *Global-Tech* did not alter the conscious avoidance standard, we hold that the district court's refusal to amend the jury instructions to accord with *Global-Tech* was not error.

In *Global-Tech*, the Supreme Court synthesized conscious avoidance holdings from eleven circuit courts in order to import the doctrine from criminal law to patent law.  131 S. Ct. at 2070 n.9 and 2068-72.  The Court did not alter or clarify the doctrine, but instead identified the common ground among the Courts of Appeals:

> [A]ll [Courts of Appeals] appear to agree on two
> basic requirements: (1) the defendant must

subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. We think *these requirements* give willful blindness an appropriately limited scope that surpasses recklessness and negligence.

*Id.* at 2070 (emphasis added).

Kimelman urges us to believe that this language, built upon, *inter alia*, Second Circuit precedent in *Svoboda*, 347 F.3d at 477-78, was designed to alter the substantive law. *Global-Tech* simply describes existing case law. In so holding, we follow other decisions in this Circuit since *Global-Tech* that have applied the traditional conscious avoidance doctrine. *See, e.g., United States v. Coplan*, 703 F.3d 46, 90 (2d Cir. 2012); *Ferguson*, 676 F.3d at 278-79.

The district court's instructions in this case properly imposed the two requirements discussed by the *Global-Tech* decision.[11] Kimelman requested that the district court

---

[11] The district court instructed that:

[A] defendant's knowledge may be established by proof that the defendant you are considering deliberately closed his eyes to what otherwise would have been obvious to him. If you find beyond a reasonable doubt that the defendant's ignorance was solely and entirely the result of a conscious purpose to avoid learning the truth, then this element may be satisfied. However, guilty knowledge *may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken.*

If, for example, you find beyond a reasonable doubt that the defendant you are considering was aware that

31

insert the word "reckless" into a list of mental states that were insufficient. However, *Global-Tech* makes clear that instructions (such as those in this case) that require a defendant to take "deliberate actions to avoid confirming a high probability of wrongdoing" are inherently inconsistent with "a reckless defendant . . . who merely knows of a substantial and unjustified risk of such wrongdoing." 131 S. Ct. at 2070-71. The district court's instructions were consistent with *Global-Tech*; we therefore affirm Kimelman's conviction.

**IV. Evidence of Kimelman's Rejection of a Plea Bargain Was Properly Excluded**

Kimelman contends that the district court erred in excluding his rejection of a plea bargain. "The trial court's . . . assessment that the probative value of relevant evidence is [] substantially outweighed by the

---

there was a high probability that he obtained information that had been disclosed in violation of a duty of trust and confidential [sic] but deliberately and consciously avoided confirming this fact, then you may find that the defendant acted knowingly. *However, if you find that the defendant actually believed that the information he obtained was not disclosed in violation of a duty of trust and confidence, he may not be convicted.* It is entirely up to you whether you find that the defendant you are considering deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.

Tr. 2019-20 (emphasis added).

danger of unfair prejudice [is] reviewed only for an abuse of discretion." *United States v. Khalil*, 214 F.3d 111, 122 (2d Cir. 2000) (internal quotation marks omitted). Kimelman argues by analogy to *United States v. Biaggi*, 909 F.2d 662, 690-93 (2d Cir. 1990), in which we held that the defendant's decision to forgo immunity out of an insistence that he was innocent was probative of his "consciousness of innocence." *Id.* at 690.

The defendant in *Biaggi* was offered complete immunity. *Id.* Relying on the difference between this and "an offer to plead guilty to reduced charges," we held that a defendant's decision to reject an offer of *immunity* was probative. *Id.* at 690-91. We did "not decide whether a defendant is entitled to have admitted a rejected plea bargain." *Id.* at 691.

This case differs from *Biaggi* because the excluded evidence here lacked any probative value. Kimelman has detailed the "devastating collateral consequences" flowing from the entry of a criminal conviction against him.[12]

---

[12] Kimelman wrote that:

The effects of [his] arrest, trial and conviction have been devastating to him, personally, emotionally, professionally and financially. [He] will never again work in the securities industry, and will be stripped of

Although the parties disagree as to the terms of the rejected plea offer, both parties concede that it would have entailed a conviction.  This was not a case where the defendant was permitted to walk away scot free and declined to do so out of a strong belief of his innocence.  Rejecting this offer was, in this case, an indication "that the defendant prefer[red] to take his chances on an acquittal by the jury, rather than accept the certainty of punishment after a guilty plea."  *Id.*

The district court briefly discussed the prejudicial effects of admitting this evidence, including the likelihood of jury confusion.  Admission would require the "collateral consequences" of a conviction to be discussed at length, requiring an already complex trial to gain additional and unnecessary dimensions.  We find that the trial court was

---

his trading licenses.  He will no longer hold his credential as a Chartered Financial Analyst.  In addition, [he] will no longer be entitled to the privilege of practicing law.  Upon the conclusion of his sentence, [he] will be left with the daunting task of finding a career without the ability to return to any of the professions he has known for the past fourteen years.  His finances are in shambles . . . with several hundred thousand dollars of debt outstanding.  And he has suffered the personal embarrassment and shame that accompanies a high profile arrest, trial and conviction.

Kimelman Sentencing Memorandum at 14.

34

within its "latitude" in excluding Kimelman's rejection of a plea agreement under Federal Rule of Evidence 403. *See Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006).

**V.  Defendants' Sentences Were Reasonable**

Goffer and Drimal challenge the substantive and procedural reasonableness of their sentences.  The role of appellate courts in sentencing is important but limited.  "We review the work of district courts under a 'deferential abuse-of-discretion standard.'"  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)).

**A.   Defendants' Sentences Were Procedurally Reasonable**

Defendants contend that the district court committed procedural error in sentencing them.  In reviewing sentencing for procedural errors, we first look for "error in the district court's calculation of the [United States Sentencing] Guidelines range."  *Id*. at 194.  Here, Drimal argues that the district court erred in its loss calculations and Goffer contends that the district court failed to consider disparities between co-defendants.

35

## 1. The Loss Calculation Was Proper

In calculating the "loss" attributable to Drimal's trading, the district court took account of the Probation Office's Presentence Investigation Report as well as submissions from the parties. The district court accepted the Government's assertion that Drimal realized gains of between $7 and $20 million, resulting in a Guidelines enhancement of 20 points. *See* U.S.S.G. §§ 2B1.4(b)(1), 2B1.1(b)(1)(K). Drimal asserted that his gains were between $2.5 and $7 million, for an enhancement of 18 points. U.S.S.G. § 2B1.1(b)(1)(J). Drimal alleges two errors in the calculation of the loss amount.

First, Drimal contends that the district court committed procedural error by failing "to deduct losses resulting from trades that emanated from the same" insider sources as provided the tips that gave him $11 million in profits. We interpret this argument as relating to the Clear Channel trades Drimal made based on the attorneys' misunderstanding of inside information. We find no precedent indicating that additional illegal trades made on material nonpublic information that result in losses should mitigate the sentences of insider traders. *Cf.* U.S.S.G. §

36

2B1.1 n.3.  If two defendants are identical save that Defendant A engaged in one more insider trade than Defendant B, there is no case in which Defendant A deserves a lesser punishment than Defendant B.  That Defendant A's additional criminal activity backfired does not affect that calculus.  The district court did not err in excluding these losses from its calculation.

Drimal also contends the district court erred in considering the Hilton trades for the calculation of the loss amount.  This contention relies on Drimal's assertion that he did not know that the Hilton trades were based on inside information until two months later (when he was recorded making statements that clearly demonstrate his awareness that his profits from the Hilton trade were illegally-obtained profits of insider trading).  Reviewing the district court's fact-finding at sentencing, we find no error in the court's extensive and well-reasoned analysis.

**2.  The District Court Considered Disparities Between Defendants**

Goffer asserts that the district court did not account for sentencing disparities between similarly-situated defendants.  This argument contains both a procedural and substantive challenge.  To the extent that Goffer asserts

37

that the district court did not *consider* the sentences of similarly-situated defendants, his claim lacks merit.[13]  The district court weighed "the need to avoid unwarranted sentencing disparity between Mr. Goffer and similarly situated defendants."  The district court distinguished between Goffer and his co-defendants and also described Goffer's role as a "leader[] of a fraudulent enterprise" who "recruited people" and poisoned other traders. Sentencing Tr. 228.  The district court demonstrated that it weighed the need for similar sentences among similarly-situated defendants; however, the court rejected Goffer's contentions as to who was situated similarly.

**B.    Defendants' Sentences Were Substantively Reasonable**

Goffer and Drimal challenge their sentences as substantively unreasonable, contending that their (120-month and 66-month, respectively) sentences are disproportionate to sentences meted out to other white collar criminals.[14]

---

[13] To the extent that it is an assertion that Goffer, as a white collar defendant, should benefit from the leniency of other courts towards other white collar defendants, we address this argument as part of the substantive reasonableness inquiry.

[14] Although defendants' challenges to their sentences also sound of Eighth Amendment jurisprudence, so construed they are devoid of merit.  *See United States v. DiTommaso*, 817 F.2d 201, 217 (2d Cir. 1987).  We therefore assume the challenges focus on the substantive reasonableness of the sentences.

Believing that the district court's well-reasoned analysis was appropriate, we affirm.

In reviewing a sentence for substantive reasonableness, we do "not substitute our own judgment for the district court's on the question of what is sufficient to meet the [18 U.S.C.] § 3553(a) considerations in any particular case." *Cavera*, 550 F.3d at 189 (citing *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006)). "We will instead set aside a district court's substantive determination only in exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *Id.* (quoting *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)).

"[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." *Id.* at 191 (citing *Kimbrough v. United States*, 552 U.S. 85, 107-08 (2007)). Defendants in this case assert that several district court judges have chosen to exercise this ability to issue below-Guidelines sentences to white collar criminals. Goffer and Drimal raise broad questions as to how harsh federal courts are,

39

and how harsh they should be, in sentencing white collar defendants.  We need not answer either question.

Assuming *arguendo* that some judges have chosen as a policy matter not to sentence white collar criminals to the harshest permissible punishments, this does not entitle other white collar criminals to lighter punishments than are reasonable under the Guidelines, 18 U.S.C. § 3553(a), and the totality of the circumstances of their individual case. *See, e.g., United States v. Rigas*, 583 F.3d 108, 121-24 (2d Cir. 2009); *United States v. Bonilla*, 618 F.3d 102, 110 (2d Cir. 2010).

**1.  Goffer's Sentence Was Substantively Reasonable**

Goffer faced a maximum of 20 years' imprisonment for each of 12 counts of securities fraud.  Goffer had an offense level of 32 and a criminal history category of I, yielding a Guidelines range of 121 to 151 months' imprisonment.  The Probation Office recommended that he be sentenced to 121 months' imprisonment.

In reaching its determination, the district court considered "Goffer's entire life from the circumstances of his birth, his upbringing, educational background and opportunities, work history, family relationships . . .

[and] the facts and circumstances of these crimes." Sentencing Tr. 12. The court also considered "[t]he need to avoid unwarranted sentencing disparity between Mr. Goffer and similarly situated defendants." *Id.* at 13.

The totality of the circumstances in this case included reasons to believe that Goffer had played a positive role in the lives of his family and friends, but also that Goffer orchestrated and ran a large-scale cash-for-tips scheme to fuel an insider trading conspiracy. Goffer took steps to disguise his wrongdoings by distributing disposable cell phones, using fake research to cover his illegal trades, and refusing to speak about sensitive topics on the telephone.

Goffer's corrosive influence on the integrity of the financial markets and on the expectation of trust and confidence between attorney and client required a significant punishment. We do not find that his below-Guidelines sentence of 120 months' imprisonment was unreasonable or disproportionate to the severity of his crimes.

**2. Drimal's Sentence Was Substantively Reasonable**

Drimal contends that his sentence of 66 months' imprisonment was substantively unreasonable in light of his

41

community service and his commitment to his family.  Drimal faced a maximum of 20 years' imprisonment on five counts of securities fraud.  His offense level of 25 and Criminal History Category of I led to a Guidelines range of 57 to 71 months' imprisonment.  The Probation Office recommended a 57-month sentence.

Drimal, who traded more heavily based on insider information than any other defendant in the conspiracy, asserts that his community service and commitment to his family should mitigate his wrongdoing.  The district court took note of his positive activities in sentencing Drimal.  The district court also noted that Drimal, who "earned" approximately $11,497,888 from trading on insider information, did not have the same compelling social disadvantages that frequently lead to and help explain criminal behavior.[15]

In light of the magnitude of his insider trading, which had major deleterious effects on the market, Drimal was no small-time criminal.  The district court noted Drimal's lack

---

[15] Contrary to Drimal's assertions on appeal, the district court did not reveal a vendetta against the rich when it noted that Drimal did not have compelling reasons to warp the financial markets.  Instead, Judge Sullivan recognized the same moral principles that make Jean Valjean more sympathetic than Gordon Gekko.

of respect for the law and his deliberate decision, weighing the risks, that insider trading "was a game worth playing." Sentencing Tr. 48. The district court's assertion that insider trading requires high sentences to alter that calculus is a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors. The district court's well-reasoned sentencing took account of the totality of circumstances, including Drimal's motivations, his positive role in his family and the community, his knowledge that what he was doing was wrong, and the severity of his crimes. We affirm.

## Conclusion

For the foregoing reasons, the judgments of conviction and the sentencing orders of the district court are **AFFIRMED**. Defendants' additional arguments are addressed in the corresponding summary order. *See Goffer*, 2013 WL 3285137.

43